UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BAKER COUNTY MEDICAL SERVICES, INC.,

      Plaintiff,

vs.                                       Case No.  3:05-cv-541-J-33HTS

SUMMIT SMITH L.L.C., et al.,

      Defendants/Third Party Plaintiffs,

vs.

ENGINEERING CONCEPTS, INC.,

      Third Party Defendant.

_____/

## ORDER

      This cause comes before the Court pursuant to a non-jury trial which was held on October 9 - 19 and 29 - 31, 2007.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  After considering all the evidence, the pleadings filed by the parties, the arguments made by counsel, and the legal authorities submitted to the Court, the Court makes the following findings of fact and conclusions of law.  To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such.  Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.  For the reasons stated below, the Court finds judgment should be entered in favor of Defendants and Third Party Defendant, Engineering Concepts, Inc.

## I.    Background

On September 20, 2005, Baker County Medical Services (BCMS) filed its second Amended Complaint, containing a single count for breach of contract, alleging that Defendants/Third Party Plaintiffs, Summit Smith, L.L.C. and C.D. Smith Construction, Inc. (collectively, "Summit Smith"), failed to design, furnish, and install an appropriate heating, ventilating, and air conditioning (HVAC) unit in the construction of a hospital, nursing home, and doctors' building in Macclenny, Florida. (Doc. #15.)  Summit Smith filed a third party complaint against Engineering Concepts, Inc. (ECI), Summit Smith's engineering sub-contractor, for contribution and indemnification in connection with the design of the HVAC system.  (Doc. #21.)

BCMS is a 501(c)(3), not-for-profit corporation that operates a full service, 25-bed rural hospital complete with an Emergency Room, operating rooms, surgical units, and a 67-bed nursing home in Baker County, Florida.  (Markos Test. Trial Tr. vol. 1, 61-62.)  In 1993, BCMS began leasing real property and hospital facilities from the Baker County Hospital Authority; the lease expires in 2023.  (Id. at 62.)  The original hospital buildings and facilities that were part of this lease were constructed in 1957.  (Id.)  Due to the age of the facilities, BCMS determined it needed to construct a new hospital facility.  (Id.)

C.D. Smith Construction, Inc., is a construction contractor based in Wisconsin,  founded in 1936. (Joint Ex. 1.)  Summit Smith Healthcare Facilities is a Wisconsin-based architectural firm which worked closely as a joint venture partner with C.D. Smith on projects around the country. (Id.)  C.D. Smith and Summit purportedly formed a joint venture known as Summit Smith[1] which submitted a bid for BCMS's new construction project.   (Spencer Test. Trial Tr. vol. 5, 248-52.)

---

[1]  The joint venture was never formalized, resulting in these two entities being general partners.  (Spencer Test. Trial Tr. vol. 5, 248-52.)

BCMS selected Summit Smith's bid to be the design-build contractor for the new facilities, and thus, BCMS and Summit Smith entered into a two-phase agreement (the "Construction Contract"). (Spencer Test. Trial Tr. vol. 6, 64-65.) The first phase consisted of site planning, financial analysis, regulatory approvals, and other pre-construction services by Summit Smith. (Id.) After completion of the first phase, BCMS opted to proceed to the second phase, the design and construction of the hospital. (Id. at 67.) Summit Smith hired ECI as a sub-contractor to provide the mechanical and plumbing engineering design services for the proposed project, including the design of the HVAC system. (Joint Ex. 4.)

The first design plans for the hospital included the installation of a type of air conditioning system known as a chiller system. (Joint Ex. 5; Birner Test. Trial Tr., vol. 11, 94-96.) During the design stage, before construction began, Summit Smith provided BCMS with HVAC system alternatives to the chiller system, including a direct expansion system (DX system) powered by multiple rooftop units. (Doc. #15 ¶ 10.) BCMS chose to install the DX system. (Id. ¶ 11.) Thus, BCMS and Summit Smith executed a change order, modifying the original contract to require the installation of a DX system, not a chiller system. (Joint Ex. 3.) Immediately following completion of construction of the hospital, the hospital's cooling system malfunctioned and did not perform correctly. (Markos Test. Trial Tr. vol. 1, 101-06.) BCMS made multiple complaints to Summit Smith, alleging that the system did not cool the facility properly. (Id.) Summit Smith responded to these complaints and attempted to remedy the problems. To correct issues of air flow, Summit Smith resealed duct work in the hospital which immediately corrected the problems. (Gellings Test. Trial Tr. vol. 7, 24.) Adjustments were also made to thermostats and temperature controls to eliminate temperature fluctuations. (Id. at 14-15.) A sound insulation blanket was installed in the

ceiling to deal with noise issues in certain areas of the hospital.  (Id. at 23.)  Various other issues

with temperature controls and sensors were referred to Summit Smith's mechanical contractors who

addressed the problems and made corrections.  (Id. at 13-42.)

However, BCMS contends that the difficulties persisted, despite Summit Smith's actions.

(Doc. #15 ¶ 25.)  Based on these allegations, BCMS asserts that Summit Smith is in breach of the

design-build contract, because Summit Smith designed, furnished and installed a DX system.  (Id.

¶¶ 26-29.)  BCMS contends that a chiller system was the proper HVAC system for the hospital, and

therefore, Summit Smith should have designed and installed a chiller system.  (Pennock Test. Trial

Tr. vol. 5, 80.)  Thus, BCMS seeks to recover the approximate cost to replace the existing DX

system with a new chiller system at a cost in excess of $1,000,000.00.  (Id. at 79.)   Additionally,

BCMS seeks to recover its "excess energy costs" as damages, desiring to recoup the higher energy

costs it incurred with the DX system.  (Doc. #15 ¶ 29.)  Summit Smith filed a claim against ECI for

common law indemnity, alleging that it is not liable for BCMS's claim, but if any damages are

assessed against Summit Smith, then ECI is wholly at fault for BCMS's claims. (Doc. #21 ¶¶ 16-17.)

## II.      Findings of Fact

BCMS and Summit Smith began a two-phase process for the construction of a medical

facility in Baker County, Florida in 1997.  (Spencer Test. Trial Tr. vol. 6, 64-65.)  Phase One

consisted of site planning, financial analysis, regulatory approvals, and other pre-construction

services.  (Id.)  When all Phase One services were performed, BCMS had the option of proceeding

to Phase Two, the design and construction phase. (Markos Test. Trial Tr. vol. 1, 73-74.) On January

27, 1998, BCMS elected to proceed to Phase Two and signed a development, design and

construction agreement with Summit Smith to design, equip and build the new facility.  (Id. at 67.)

The Construction Contract was a design-build contract that included the drawings, specifications, addenda and all change orders subsequently executed by the parties.  (Joint Exs. 3, 4.)

A design-build contract creates a different relationship between the owner and the contractor. (Pennock Test. Trial Tr. vol. 5, 239-41.)   The traditional relationship between the owner and the architect and the contractor in a construction project involves two separate agreements between the owner and each respective entity, with each professional providing their separate services.  (Id.)  A design-build contractor provides a unified construction product for the owner that expressly includes both the design of all of the building's systems and the actual construction of the project, instead of two entities providing the limited and distinct services of their respective professions to the owner. (Id.)  The design-build contractor takes on all of the responsibilities and obligations of the project, providing both the design and the construction services to the owner, and these joint obligations extend to the owner throughout the entirety of the contractual relationship.  (Id.) Therefore, the design-build contractor is responsible for making design recommendations to the owner and taking responsibility for the sufficiency of those design plans.  (Id.)

Dennis Markos, CEO of BCMS, was the only person for BCMS who had the authority to sign the Construction Contract with the design-build contractor, Summit Smith, or any subsequent change orders related to the project.  (Markos Test. Trial Tr. vol. 1, 78.)  Jerry Spencer, a licensed architect from Summit, managed the Construction Contract for Summit Smith, succeeding Wally Haines, of C.D. Smith, who originally handled the bid and the negotiations of the Construction Contract.[2]  The original bid by Summit Smith, as well as the subsequent Construction Contract and the plans and specifications included in the Construction Contract, originally included the

---

[2] Mr. Haines died of a heart attack on the same weekend that the contract was presented to BCMS.

installation of a chiller HVAC system. (Joint Ex. 5; Birner Test. Trial Tr., Vol. 11, 94-96.) In a chiller system, piping is installed throughout the facility. The piping is placed between liquid chilling equipment and air handling equipment to produce appropriately cooled ventilation throughout the building. By March 9, 1998, Summit Smith and ECI had already begun the design of the chiller HVAC system for BCMS. (Birner Test. Trial Tr. vol. 11, 86-88.)

BCMS hired Michael Matejevich, a friend of Mr. Markos, to consult regarding financing and construction of the new facility. (Markos Test. Trial Tr. vol. 1, 199-200.) Mr. Matejevich is the principal of a healthcare consulting firm known as Healthcare Affiliates, Inc., located in Towson, Maryland. (Matejevich Test. Trial Tr. vol. 2, 73-74.) In late May and early June of 1998, Mr. Matejevich contacted Mr. Spencer regarding construction cost concerns. (Spencer Test. Trial Tr. vol. 6, 80-81.) Mr. Matejevich was actively involved in helping BCMS obtain bond financing. (Spencer Test. Trial Tr. vol. 6, 114.) Mr. Matejevich asked Summit Smith to provide options that might lower BCMS's initial costs. (Id. at 81.) Mr. Markos desired to increase the size of the medical office building. (Markos Test. Trial Tr. vol. 1, 112.) The larger office building created a benefit to BCMS by allowing Mr. Markos to attract specialty doctors to work at BCMS, a rural county hospital. (Markos Test. Trial Tr. vol. 2, 115.) Mr. Matejevich initiated the conversations regarding cost cutting or "value engineering." (Spencer Test. Trial Tr. vol. 6, 75-77.) Value engineering considers the initial cost of construction, coupled with the estimated cost of the maintenance, energy use, life expectancy and replacement costs. (Hahn Test. Trial Tr. vol. 11, 209-210.) Value engineering is a normal part of the construction process, is common in the industry and is often used to reduce costs in a construction project. (Pennock Test. Trial Tr. vol. 5, 8-10.)

BCMS had a history of trying to reduce costs on the project, and the request to try to reduce costs further was consistent with BCMS's prior conduct.  As a result of the joint efforts of Summit Smith and BCMS, the project cost had been reduced to about $150 per square foot when other hospitals were being built for approximately $200 per square foot at that time.  (Spencer Test. Trial Tr. vol. 6, 183.)  In response to Mr. Matejevich's request, Mr. Spencer outlined several different options for significantly reducing construction costs, by changing the HVAC system.  (Id. at 76.) To assist in this process, a document known as the HVAC Options Grid (the "Grid") was produced which compared various attributes of different HVAC system options that were available to BCMS. (Pls. Ex. 3.)  The creation of the Grid was a collaborative effort between Mr. Spencer at Summit Smith and Len Birner, a principal at ECI and the mechanical engineer who designed the HVAC system installed at BCMS.   (Spencer Test. Trial Tr. vol. 6, 160-61.)

The Grid lists the HVAC options in order of installation costs, and it was organized such that the system with the lowest installed cost was presented first.  (Id. at 82-83.)  Each option was then compared to the least expensive system based on cost and payback.  (Id.)  Payback describes the amount of time it would take to break even on a more expensive system that operates more efficiently.  (Id. at 85.)  Sometime between June 9, 1998 and July 30, 1998, Mr. Spencer traveled to Florida to present the Grid to Mr. Markos for the purpose of examining and discussing the system choices that were available to BCMS.  (Id. at 80; Markos Test. Trial Tr. vol. 1, 84.)  The Grid showed roughly ten options with varying components, the cost of each option, the anticipated energy cost amounts and differences, and other information.  Mr. Spencer met with Mr. Markos and Alan Clotworthy,[3] who was the maintenance director at BCMS during the design and construction of the

---

[3]  Mr. Clotworthy retired from BCMS in 2003 because he was suffering from health
(continued...)

new facility and immediately after BCMS took occupancy of the facility.  (Spencer Test. Trial Tr. vol. 6, 80; Markos Test. Trial Tr. vol. 1, 84.)  At the meeting, Mr. Spencer explained to Mr. Markos how to utilize the Grid, and Mr. Markos was able to eliminate over half of the options at that meeting.  (Spencer Test. Trial Tr. vol. 6, 132-33.)  Mr. Markos eliminated all HVAC options that were "PTACs," which is a system that includes individual wall units in patients' rooms.  (Markos Test. Trial Tr. vol. 1, 88.)  Mr. Markos felt that these were unsightly and not consistent with the quality appearance that BCMS wanted for this new facility (including its nursing home), regardless of any first-cost savings that may be associated with using a PTAC system.[4]  (Id.)

Mr. Markos claimed he looked only at the two columns on the far right side of the Grid which showed simulated annual HVAC energy cost difference and simple payback in years, and ignored the rest of the columns.  (Markos Test. Trial Tr. vol. 1, 89.)  Mr. Markos testified that he misread the column showing simulated annual energy costs, since it showed a negative number for the DX system.  (Id. at 90.)  Mr. Markos interpreted this to mean that the DX system had less annual energy costs that the other systems on the Grid.  (Id.)  However, Mr. Spencer testified that the figures in each column reflected a comparison to the first, and least expensive, HVAC system on the Grid.  (Spencer Test. Trial Tr. vol. 6, 82-83.)  The first option listed on the Grid had an annual energy cost of $107,827; the DX system had an annual energy cost of $128,700.  (Id. at 86-87.)  Each option's annual energy costs were subtracted from the baseline comparison of the first HVAC system listed on the  Grid.  (Id. at 86.)  Therefore, the Grid displayed a negative number once the

[3](...continued)
problems which affected his memory and his ability to perform his duties as maintenance director.

[4]  In the Grid, option 2C is the chiller system that was originally specified in the contract. In the Grid, Option 2 is the DX system, which BCMS eventually elected to have installed.  (Pls. Ex. 3.)

DX system's energy costs were subtracted from the first option's energy costs.  (Id.)  However, despite the negative number, the DX system had a higher annual energy cost.  (Id. at 87.)  Every column on the Grid was calculated as such, comparing each system to the first system listed on the Grid, which had the least expensive installation cost.

Mr. Markos also testified he asked one question of Mr. Spencer regarding the Grid: "Based on this [Grid], you're saying that if I pay the $345,000 more for [the chiller system], I would not earn my money back because it – the annual energy cost difference was a position, or more than the negative number 20,873?"  (Markos Test. Trial Tr. vol. 1, 95.)  He further testified that Mr. Spencer did not respond to the question and did not inform him that he was looking at the Grid incorrectly; in fact, Mr. Markos testified that his question was only greeted with a blank stare.  (Id.)  Mr. Spencer testified that he was not asked any specific questions by Mr. Markos, and he would not let a question by a client go unanswered.  (Spencer Test. Trial Tr. vol. 6, 181.)  He further testified that during his extensive interactions with Mr. Markos, it appeared to him that Mr. Markos was a knowledgeable, sophisticated business person who understood the discussions they were having and paid close attention to the details of the project.  (Id. at 176-77.)  According to Mr. Spencer, Mr. Markos always asked many questions whenever Summit Smith had business dealings with him.  (Id. at 177.)

Mr. Markos testified that the meeting lasted only fifteen minutes, and he was pressured into making a decision at that time.  (Markos Test. Trial Tr. vol. 1, 95.)  However, Mr. Spencer stated that at the time of the meeting, Mr. Markos indicated that he was not going to make a final decision that day and that he wanted further time to evaluate his options.  (Spencer Test. Trial Tr. vol. 6, 89, 193.)  Mr. Spencer further testified that after the meeting, and before the change order was signed,

Mr. Markos contacted Mr. Spencer.  (Id. at 89.)  Mr. Markos advised Mr. Spencer that he was going to consult with Mr. Matejevich on the decision.  (Id.)

Approximately four to six weeks after the meeting, Mr. Markos arranged a conference call with Mr. Matejevich, Mr. Clotworthy and Mr. Spencer to discuss the various HVAC system options. (Id. at 142; Pls. Ex. 152; Defs. Ex. 113.)  Although a decision was not reached during the conference call, everyone had the opportunity to ask questions and communicate with one another. Mr. Markos contacted Mr. Spencer within two days of that conference call, by phone, to advise that BCMS had decided to select the DX HVAC system.  (Spencer Test. Trial Tr. vol. 6, 196.)  Mr. Spencer then prepared Change Order No. 1 which was signed on July 28, 1998 by Mr. Markos and Mr. Spencer.  (Joint Ex. 26.)  Reducing the cost under Change Order Number 1 provided a $338,000 credit to BCMS for selecting the DX HVAC system.[5]   (Spencer Test. Trial Tr. vol. 6, 90.)

Change Order No. 1 provided BCMS with a $338,000 credit which was applied directly to the cost for increasing the size of the medical office building.  (Id.)  This resulted in an increase in the size of the medical office building by eighty percent.  (Markos Test. Trial Tr. vol. 2, 113.)  The additional medical office building space directly benefitted BCMS.  (Id. at 115.)  By allowing more specialty doctors to practice at the hospital, BCMS generated more revenue by referring patients to the ambulatory services and outpatient care.  (Id.)  The expansion of the medical office building was a priority to Mr. Markos.  (Markos Test. Trial Tr. vol. 1, 75-76, 112.)  Later in the project, Mr. Markos received an appropriation from the state in the amount of $650,000, which he used to expand the medical office building a second time.  (Id. at 75.)  The Court finds Mr. Markos, an

---

[5]   The Construction Contract states in Section 1.0 that the Contract Documents include all Change Orders signed after the execution of the agreement.  The Grid was not referenced in the Change Order and was never attached to or made part of the Construction Contract.

experienced and informed businessman, chose to have the DX system, with its less expensive installation costs, placed in the hospital.  The Court finds Mr. Markos made a conscious choice to save costs, despite his claims that first costs were not an issue.  In fact, BCMS eventually negotiated a contract price that was twenty-five percent below the market value for hospital construction at that time.  (Spencer Test. Trial Tr. vol. 6, 183.)  The Court find it more credible that Mr. Markos had an interest building the hospital facilities for the lowest cost possible, thus providing a greater cash flow to BCMS.

Summit Smith proceeded to design, construct and install four DX units in the hospital.  The DX system selected by Summit Smith was the multiple rooftop units (RTUs) of a Freon-type, refrigerant-based direct expansion system, totaling 211 tons cooling capacity.  (Robey Test. Trial Tr. vol. 4, 55-59.)  The four DX units were intended to provide HVAC services to the hospital as follows: RTU 1, a 50-ton DX system unit serving the hospital's administrative offices and the medical unit, which includes patient rooms;  RTU 2, a 70-ton DX system unit serving the hospital's surgery, ER and laboratory units; RTU 3, a 20-ton DX system unit serving the hospital's kitchen area; and RTU 4, a 70-ton DX system unit serving the nursing home which included residents' rooms.  (Id.)  The four DX system units are "draw-through" packaged, factory-made, rooftop units as compared to "blow through" units.  (Robey Test. Trial Tr. vol. 12, 175-181.)  This distinction, while not functionally significant to the overall operation of the cooling system, is apparent to the unit's physical appearance.  Specifically, a "draw-through" unit has its fan  physically located after the cooling coils, thus "drawing" the air created by the large fan over the coils instead of "blowing" the air.  (Id. at 176-77.)  In August 2000, a start-up was performed on the DX system, and BCMS took final occupancy of the facilities in May 2001.  (Markos Test. Trial Tr. vol. 1, 101-02.)

A.      Completion of the Construction Contract

Maria Allen, Chief Financial Officer of BCMS, was the person responsible for processing Summit Smith's application for payment.  (Allen Test. Trial Tr. vol. 4, 10.)  Applications for payment were submitted periodically by CFO Allen.  (Id. at 10-12.)  On July 18, 2001, CFO Allen processed an application for payment and requested BCMS's bank to wire transfer $125,000 to Summit Smith.  (Pls. Ex. 30(e).)  Two additional payments were made after this payment: $178,155.66 on December 27, 2001 and $7,750.00 on February 8, 2002. ( Pls. Ex. 30.)

During the time that CFO Allen was processing these various final payments, BCMS was provided a letter dated August 1, 2001, from a law firm that was representing Miller Electric Company, a subcontractor that had provided electrical materials and labor on the construction project. (Pls. Ex. 31.)  The law firm claimed that the subcontractor was still owed a significant balance for its work on the project through May 9, 2001, which created a lien against BCMS's facilities.  (Id.)  Pursuant to section 255.05(1)(a), Florida Statutes, the correspondence requested contract and bond information pertaining to performance and payment obligations.  (Id.)  Because the Construction Contract required such payments and lien issues to be resolved before the contract was considered complete, BCMS could not continue to process any further final payments.  (Allen Test. Trial Tr. vol. 4, 13-14.)  However, on December 26, 2001, Summit Smith confirmed that the issue with this particular subcontractor had been resolved and as required by the terms of the contract, "All subcontractors, suppliers and vendors have been paid in full."  (Pls. Ex. 32.)  It was only after these outstanding lien and payment issues were resolved by Summit Smith that the final payments on December 27, 2001, and February 8, 2002, were made in order to complete the Construction Contract.  (Pls. Ex. 158.)

B.      The Grid

BCMS alleges that the Grid did not comport with the professional standards of care and it did not appropriately present the HVAC options to Mr. Markos so that he could make an informed decision.  BCMS's expert was Tim Pennock, a licensed professional engineer, practicing with GRG Engineering in Maitland, Florida.  (Pennock Test. Trial Tr. vol. 4, 172-73.)  GRG is a large national consulting engineering firm that focuses on designing mechanical and electrical systems for buildings.  (Id. at 173.)  Mr. Pennock has a mechanical engineering degree from Rochester Institute of Technology and an MBA from Syracuse University.  (Id. at 180-81.)  Before joining GRG in Maitland, Florida, he was a mechanical engineer working on projects in New York, Boston, Massachusetts, and Cleveland, Ohio.  (Id. at 180.)  Mr. Pennock is the head of GRG's HVAC Commissioning Department.  (Id. at 177-78.)   Mr. Pennock and his Commissioning Department review the designs of HVAC systems throughout GRG, and then also work with the contractors in the field to make sure the HVAC systems designed are going to perform correctly after the HVAC systems are installed.  (Id.)  According to Mr. Pennock, using only a one-page chart to inform a hospital owner of the risks and benefits of changing from the preferred chiller system to the DX system for a hospital fell below the standard of care for a contractor.  (Pennock Test. Trial Tr. vol. 5, 94-97.)   However, the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) guidelines, which were relied upon by Mr. Pennock indicate that a DX system is acceptable for a healthcare facility and DX is used successfully on healthcare facilities. (MacPhaul Test. Trial Tr. vol. 9, 101-02.)

Summit Smith's expert, Dave MacPhaul graduated from the University of Massachusetts at Amherst with a Bachelor of Science in mechanical engineering in 1984 and attended graduate school

in mechanical engineering at the University of Minnesota from 1985 through 1989. (MacPhaul Test. Trial Tr. vol. 8, 135.)  Mr. MacPhaul is a licensed mechanical engineer specializing in HVAC forensic engineering and commissioning.  (Id. at 135-38.)  Mr. MacPhaul opined that the Grid comports with the standard of care that would be used by a reasonable engineer in Florida.  (Id. at 209-10.)  The Grid provides a brief description of the types of systems being compared, construction cost, equipment and equipment installation costs, estimated energy costs and the annual energy cost savings or expense.  (Id. at 210.)

ECI's expert, Warren Hahn, graduated from the United States Naval Academy in 1960 with a degree in mechanical engineering.  (Hahn Test. Trial Tr. vol. 11, 154.)   Mr. Hahn specializes in mechanical, electrical, plumbing and fire protection engineering.  (Id. at 153.)  Mr. Hahn is a registered Professional Engineer in Florida, Georgia, North Carolina and Wisconsin.  (Id. at 151-52.)  Mr. Hahn has over 45 years of experience working in the field of mechanical engineering and HVAC system design.  (Id. at 151-58.)  Mr. Hahn is also the former President of ASHRAE.  (Id. at 160.)  Mr. Hahn does not believe the presentation of the Grid or the information contained in the Grid falls below the standard of care for the industry.  (Hahn Test. Trial Tr. vol. 12, 73.)  Mr. Hahn testified that the information contained in the Grid was presented in such a way that a hospital CEO would be able to understand it and make an informed decision.  (Id. at 72-73.)  The Court finds that while the Grid is not a model of clarity, the information contained in the Grid is correct and BCMS did not present any evidence to purport that the information in the Grid was incorrect.

C.    Selection of DX System

BCMS alleges that the DX system did not comport with the industry standards of care.  All of the engineers that testified in this matter, including Mr. Pennock, agreed that specifying a DX

system for this facility was not malpractice.  Mr. MacPhaul opined that the use of a DX HVAC system for this application comports with the standard of care that would be used by a reasonable engineer in Florida and that the specification of a DX system is perfectly acceptable for this particular facility.  (MacPhaul Test. Trial Tr. vol. 8, 211, 251-52.)

Dr. Todd Rossi, who testified for Summit Smith, serves as the chairman of the ASHRAE Program Monitoring Subcommittee, which evaluates the performance of HVAC equipment throughout the United States.  (Rossi Test. Trial Tr. vol. 8, 41.)   Dr. Rossi obtained a bachelor's degree in electrical engineering from the State University of New York at Buffalo, a master's degree in applied physics from the California Institute of Technology, and a Ph.D. in mechanical engineering specifically focused on HVAC performance, evaluation and diagnostics from Purdue University.  (Id.)  Dr. Rossi testified that there is nothing improper about using DX as a cooling system in this application.  (Id. at 54-56.)  Moreover, Mr. Hahn testified that there is nothing inappropriate in specifying a DX system for a Florida healthcare facility the size of BCMS's which has continuous operation.  (Hahn Test. Trial Tr. vol. 11, 210-211.)  Mr. Hahn provided a list of healthcare facilities in Florida which utilize DX HVAC systems.  (ECI Ex. 259.)  Mr. Birner was satisfied the DX system was appropriate for a healthcare facility in Florida; Mr. Birner further testified to the advantages of using a DX system over a chiller system.  (Birner Test. Trial Tr. vol. 11, 46.)  The DX system has a lower first cost and allows flexibility for future expansion which is not offered by a chiller system.  (Id.)  DX systems are easier to maintain than chiller systems, and there is built in redundancy[6] in a DX system.   (Id.)

_____

[6] Most of the DX units have two compressors so that if one compressor fails, the other will continue to provide cooling.  Even if the units only had one compressor, there is redundancy in the DX system because, with four units, if one fails, the other three continue to cool the adjacent spaces.

(continued...)

In Mr. Pennock's opinion, it is unusual to design and install a DX system in a healthcare facility. (Pennock Test. Trial Tr. vol. 5, 22-23.) A package DX RTU is more appropriate for a light commercial building and not an "institutional" building, in his opinion. (Id.) Mr. Pennock stated that a chiller system more easily regulates and controls the temperature and humidity of an institutional building, like a hospital. (Id. at 26-27.) However, Mr. Pennock would not testify that the designer committed professional malpractice by allowing BCMS to select a DX system. (Id. at 133.) In fact, Mr. Pennock admitted that he did not think it was professional malpractice to allow BCMS to select a DX system. (Id. at 133-35.) Mr. Pennock testified that a chiller system was a better and preferred option for a Florida hospital, but he was not willing, when pressed, to testify that the installation of a DX system was malpractice. (Id. at 132-35.)

D.      Approval of the Construction Plans

Prior to commencement of the project, the design had to go though an extensive application process to receive approval for the new facility by the Florida Agency for Healthcare Administration (AHCA). AHCA is the Florida governing agent for healthcare related projects in the state. (Birner Test. Trial Tr. vol. 10, 39-40.) Prior to approving the project, AHCA reviewed the design and met with Mr. Birner. (Id. at 40-41.) AHCA also made onsite inspections of the building to insure the building was being installed per AHCA requirements and was consistent with the AHCA approved drawings. (Id. at 40.) ECI first met with Randy Davis of AHCA in December 1997 when Mr. Birner traveled to Tallahassee with the architect and the electrical engineer to present the design to AHCA. (Id. at 39-40.) Mr. Birner met with Mr. Davis again in September 1998 to present the

_____

[6](...continued)
In a chiller system, if the chiller fails, the entire facility will be without cooling. (Rossi Test. Trial Tr. vol. 8, 105-06; Birner Test. Trial Tr. vol. 11, 6.)

second stage review of the design prior to receiving final approval of the mechanical design.  (Id. at 59-60.)  Mr. Birner informed Mr. Davis that a different HVAC system than the one he had presented to him during the preliminary phase back in 1997 would be installed in the hospital, and that the new system was a DX system.  (Id.)  AHCA approved the construction plans with the DX system.  (Id. at 61.)  AHCA also inspected the project numerous times during construction and never raised an issue regarding the fact that a DX system was installed as opposed to a chiller system.  (Birner Test. Trial Tr. vol. 10, 78-79; Markos Test. Trial Tr. vol. 2, 49.)

Additionally, BCMS leases the hospital and nursing home from the Baker County Hospital Authority.  The Hospital Authority hired a third-party design firm, known as Cannon Design, to oversee the project on its behalf.  (Markos Test. Trial Tr. vol. 1, 119-120.)  Steven Gartman worked for Cannon Design as an architect and was assigned to observe and to report back to the Hospital Authority regarding the progress of the construction project and his observations of the project.  (Gartman Test. Trial Tr. vol. 6, 35.)  Mr. Gartman is a Florida licensed architect and is experienced in healthcare design.  (Id. at 46-47.)  Mr. Gartman visited the site, observed the progress of construction and  reviewed the shop drawings for the project.  (Id. at 37.)  Mr. Gartman prepared a detailed report for each visit and submitted the reports to the Hospital Authority and BCMS.  (ECI Ex. 252A-CC; Defs. Ex. 32A-Y.)   Mr. Gartman never raised any objections to the use of a DX system and was aware the DX system was being used.    (Gartman Test. Trial Tr. vol. 6, 48-49.)  Likewise, the Hospital Authority never raised any objections to the installation of the DX system and approved the project design and construction.  (Id. at 54.)

E.      Evaluation of the DX System Design and Performance

Mr. Pennock alleges that the DX system is undersized based upon cooling load averages from other healthcare facilities designed by GRG as compared to the cooling loads of BCMS's facility.  (Pennock Test. Trial Tr. vol. 5, 127-28.)  In designing the system ECI determined that the facility needed 211 tons of cooling capacity.  (Hahn Test. Trial Tr. vol. 11, 175.)  Mr. Pennock maintained that this was an insufficient capacity.  After construction, the HVAC installer asserted that the system was sized incorrectly, and that instead of one 70-ton unit, two 70-ton units were needed.  (ECI Ex. 193, 194; Pls. Ex. 6I.)  After this concern was forwarded to Mr. Birner, he responded that the installer had based his calculation on incorrect and inaccurate hypothetical conditions.  (Birner Test. Trial Tr. vol. 10, 106-08.)  Mr. Birner then confirmed that the need for one 70-ton unit was correct using proper design parameters.  (Id.)  Mr. Markos stated in a letter written after the system was reviewed by BCMS's first HVAC consultant, Wayne Kelly, that "both of their consulting engineers agree that the calculated tonnage specified is appropriate." (Joint Ex. 21.) Mr. Hahn conducted an independent review of the sizing of the system and found that the tonnage used by Mr. Birner was sufficient.  (Hahn Test. Trial Tr. vol. 11, 174-77.)  Mr. MacPhaul also agreed that Mr. Birner sized the units appropriately.  (MacPhaul Test. Trial Tr. vol. 9, 69, 113-14.)  Neither Mr. Hahn, Mr. MacPhaul, nor Mr. Kelly, believed that the various additional tonnage requirements suggested by Mr. Pennock were necessary or appropriate.  Mr. Pennock never performed any load calculations for the facility, nor did he provide any backup documentation regarding the GRG projects he selected to compare to the hospital.  (Pennock Test. Trial Tr. vol. 5, 129-30, 235-63.)

It was also shown that the indoor or space temperature and humidity requirements of the facility were being met by the HVAC system BCMS selected, as evidenced by a lack of documented

complaints regarding temperature and humidity within the spaces, a lack of infection control issues, measurement of the actual temperatures and humidity within the spaces, and the fact that BCMS has remained open and operating for the past eight years without replacing the system.  Mr. Kelly stated in his report that temperature and relative humidity were satisfactory.  (Markos Test. Trial Tr. vol. 2, 69.)  Based on temperature and humidity data collected by Mr. MacPhaul, the temperature and relative humidity data collected from the hospital facility was within the established guidelines. (Defs. Ex. 84.)  BCMS has presented no documentation or evidence of temperature or humidity complaints by doctors or patients, or of infection control issues which are the result of deficiencies in the HVAC system.   BCMS has never been fined or made to cease operations by any administrative agency because of problems with the HVAC system.  (Markos Test. Trial Tr. vol. 2, 154.)  AHCA inspects healthcare facilities on an annual basis, and BCMS has never been cited for failing to meet temperature or humidity ranges.  (Id. at 79.)

Mr. MacPhaul was the only expert who measured the actual space temperature and humidity to determine whether the HVAC system was meeting BCMS's needs.  BCMS's current maintenance director, Doug Robey, indicated problem areas as he escorted Mr. McPhaul through the facility. (MacPhaul Test. Trial Tr. vol. 8, 145-46.)  Mr. MacPhaul placed temperature and relative humidity data loggers in areas in the facility that Mr. Robey indicated were complaint areas, as well as in the return air, mixed air and discharge air sections of the air handling units.  (Id.)  The data loggers were in place for nine days, from August 15 until August 24, 2006.  (Id. at 144-45.)  The data loggers took measurements at five minute intervals to record the actual temperature and humidity in the spaces. (Id.)  During the time the measurements were recorded, the outdoor air temperatures met or exceeded the maximum temperatures within which a HVAC system should designed to function,

as set forth in the ASHRAE handbook.  (MacPhaul Test. Trial Tr. vol. 9, 88-89.)  The temperatures measured inside the facility were within the ASHRAE standards for acceptable temperatures.  (MacPhaul Test. Trial Tr. vol. 8, 163-71.)  The temperature and humidity ranges which were present at the facility were not at levels which would cause infection control to be an issue.  (Id.)  Mr. MacPhaul did not find that the humidity levels at the facility would create conditions which would in any way be legitimate health risks.  (Id.)

However, Mr. Pennock urged that the "Guidelines for Design and Construction of Hospital and Healthcare Facilities AIA 1996/97" (the AIA Guidelines) should be applied to determine the standard design parameters for an HVAC system.  (Pennock Test. Trial Tr. vol. 4, 225.)  The AIA Guidelines require that the temperature in a hospital's patient rooms must be able to reach 70° to 75° Fahrenheit.  (Id. at 221.)  To achieve this, the supply air discharged from the HVAC system must be at 55° Fahrenheit.  (Id. at 220-25.)  Supply air at 55° Fahrenheit ensures that these standards can be met on a regular basis.  While Mr. Pennock now insists that the AIA Guidelines are applicable for certain portions of the facility, he did not address the AIA Guidelines in his initial report.  Mr. Pennock admited that he specifically referenced the ASHRAE standards in his reports, but he never mentioned the AIA Guidelines in his first three reports.  (Pennock Test. Trial Tr. vol. 5 , 120-21.)  When Mr. Birner designed the mechanical system in August 1998, the AIA Guidelines relied upon by Mr. Pennock had not been adopted in Florida.  (Birner Test. Trial Tr. vol. 10, 65.)  AHCA provided a list of all codes applicable to the project, including mechanical codes.  (Id. at 45-46.)  The AHCA list did not reference the AIA Guidelines.  (Id.)  Mr. Birner reviewed the AHCA code requirements and found no reference to the AIA Guidelines.  (Id.)  AHCA made it clear in its design requirements that the AHCA guidelines were to be followed and not the AIA Guidelines.  (Id. at 76-

77.)  The Court finds that the AIA Guidelines were not a requirement in hospital construction at the time of this project, and the AHCA Guidelines set the applicable performance standards for this hospital.

The goal in designing HVAC systems is to maintain an appropriate range of space temperatures and humidity.  All of the standards relate to the actual space temperatures.  To determine whether the HVAC system is meeting the owner's requirements, the space temperatures must be measured.  (MacPhaul Test. Trial Tr. vol. 8, 53-54.)  The space temperature and humidity readings obtained by Mr. MacPhaul met the requirements of ASHRAE.  (Id. At 163-71.)  Mr. MacPhaul found the temperature range for the spaces to be within a half degree of 72° Fahrenheit.  (Id. at 187.)  The space temperature and humidity readings also met the requirements of AIA Guidelines for the spaces where the AIA Guidelines were relevant.  (Id. at 162-65.)

Mr. Pennock relied on the return air temperature to support his conclusion that the system was not meeting either ASHRAE or AIA Guidelines.  (Pennock Test. Trial Tr. vol. 5, 185.)  Mr. Pennock testified that since the air in every space is re-circulated back to the HVAC unit, the return air temperature provides an accurate measure of the average space temperatures.  (Id.)  Dr. Rossi and Mr. MacPhaul stated that return air temperatures are not equivalent to the average space temperatures.  (Rossi Test. Trial Tr. vol. 8, 54-55; MacPhaul Test. Trial Tr. vol. 8, 180-81.)  Return air is drawn from the upper portions of the room; because hot air rises, the air at the ceiling is warmer than the air at occupant level.  (MacPhaul Test. Trial Tr. vol. 8, 180-81.)  Return air also travels through the return air ducts, which at BCMS means traveling through the attic in uninsulated ductwork where the air is likely to warm up further.  (Rossi Test. Trial Tr. vol. 8, 54-55.)

BCMS has also argued that the system is insufficiently designed because discharge air temperatures sometimes fluctuated slightly above 55°.  "Discharge air" is the air which has just passed across the cooling coils.  (MacPhaul Test. Trial Tr. vol. 9, 37-38.)  The goal is to produce discharge air temperatures of approximately 55°.  (Id.)  Even with some minor fluctuation in discharge air temperatures, Summit Smith's experts testified that the system is not underdesigned and continues to produce appropriately tempered air for the facility.  BCMS relied largely on daily temperature trend log data in support of its contention that the discharge air temperatures rise above 55°.  Mr. Birner received temperature trend logs which provided detailed system data from the system start-up in August 2000 until October 2002 that indicated that the system was not meeting the 55° manufacture design specifications.  (Pls. Ex. 6.)  Mr. Birner believed at that time that the units were not performing as stipulated by the DX unit manufacturer.  (Id.)

However, Mr. MacPhaul found numerous errors in the data which suggested that the sensors recording the daily temperature trend data provided inaccurate information.  (MacPhaul Test. Trial Tr. vol. 8, 183.)  According to data relied upon by BCMS, the outside air temperature would stay constant for twelve hours during the middle of the day; humidity readings in the hospital reflected humidity of 35% which would have required that the air handling units cool the air down to about 38° or 40°.  (Id. at 183-84.)  Those situations were very unlikely to occur and demonstrated that the trend log data was unreliable.  (Id.)  Timothy Fredrickson, BCMS's current service technician, also acknowledged that the built-in sensors were out of calibration.  (Fredrickson Test. Trial Tr. vol. 3, 180.)

Dr. Rossi's report contained measurements of the discharge air temperatures which he recorded for all four DX units at the hospital.  (Rossi Test. Trial Tr. vol. 8, 48-49.)  Dr. Rossi's

measurements show discharge air temperatures of 54° for RTU 1, 54° for RTU 2, 51° for RTU 3, and 55° for RTU 4. (Defs. Ex. 87.)  Mr. Pennock's measurements also show that on the day he took his measurements, it was 98° outside and as hot as 173° on the roof, yet the system was meeting the discharge air requirements.  (Pls. Ex. 59 at 37.)

      F.     <u>Maintenance of the DX System</u>

      Since 2001, BCMS has asserted that the hospital's HVAC system was incorrectly designed and that the flawed design resulted in the system performance issues experienced by BCMS.  (Joint Exs. 12, 14, 19; ECI Ex. 182.)  However, BCMS became responsible for maintaining the HVAC equipment upon taking occupancy of the facility, which occurred between April and August 2000. (Markos Test. Trial Tr. vol. 2, 50, 100-01.)  Maintenance is a standard part of the proper operation of HVAC equipment.  (Rossie Test. Trial Tr. vol. 8, 54.) When BCMS took possession of the facility the maintenance staff was provided with HVAC operation and maintenance manuals and training. (Markos Test. Trial Tr. vol.2, 51.)  The evidence indicates that BCMS failed to maintain the system once it was in its possession, despite warnings from service technicians that maintenance was important and was not being performed.  Also, BCMS did not maintain any records of any preventative maintenance performed.  (Robey Test. Trial Tr. vol. 4, 119; Birner Test. Trial Tr. vol. 11, 11.) Mr. Frederickson and Mr. Birner both testified that failing to properly maintain an HVAC system can lead to a degradation in performance.  (Frederickson Test. Trial Tr. vol. 3, 173; Birner Test. Trial Tr. vol. 11, 10-11.)  If the equipment was not maintained properly, the units would not perform properly.  (Birner Test. Trial Tr. vol. 11, 10-11.)  Improper performance would result in reduced cooling capacity and air flow.  (<u>Id.</u>)  Reduction in air flow could also jeopardize the pressurization of the spaces.  (<u>Id.</u>)  Even Mr. Pennock agreed that improper maintenance could put

a heavy strain on the system as dirty filters or leaks in refrigerant strain the equipment, and, thus, the equipment is not able to operate at full capacity.  (Pennock Test. Trial Tr. vol. 5, 124-25.)  A resolution of maintenance issues would resolve any of these operating problems.  (Rossi Test. Trial Tr. vol. 8, 52.)

BCMS was informed by Brooks Air, an HVAC service company, that it needed to obtain a maintenance contract for the DX units.  (Markos Test. Trial Tr. vol. 1, 122.)  However, BCMS did not enter into a maintenance contract, instead choosing to seek assistance when the system experienced a failure.  (Id. at 122-23.)  Mr. Hahn testified that performing service only after the equipment breaks down is not recommended by ASHRAE.  (Hahn Test. Trial Tr. vol. 12, 40-47.)  Thomas Zimmerly, who performed maintenance on BCMS's HVAC system on behalf of Brooks Air, testified that a maintenance contract would have helped prevent the problems that BCMS was experiencing.  (Zimmerly Test. Trial Tr. vol. 7, 118-26.)  Poor maintenance by BCMS included failing to change filters in a timely manner, installing improperly sized belts, failing to lubricate fan shafts and failing to properly check superheat.  (Id. at 119-22.)  Mr. Clotworthy's successor, Mr. Robey, admits that there were maintenance problems with the HVAC system when he was hired, and his predecessor had not been properly maintaining the system.  (Robey Test. Trial Tr. vol. 12, 207.) The Court finds that any system performance issues with the hospital's DX system likely resulted from the lack of proper maintenance, and not from a faulty design.

III.    **Conclusions of Law**

A.    <u>Breach of Contract Claim Against Summit Smith</u>

Under Florida law, to establish a claim of breach of contract, a plaintiff must show: 1) the formation of a valid contract, 2) a material breach of that contract, and 3) damages resulting from that breach. <u>Beck v. Lazard Freres & Co.</u>, 175 F.3d 913, 914 (11th Cir. 1999). BCMS has alleged that Summit Smith breached its implied duty to fulfill the Construction Contract pursuant to established industry and professional standards. Florida law contemplates an action based on professional negligence or the failure to perform in accordance with a standard of care. <u>CH2M Hill Southeast, Inc. v. Pinellas County</u>, 698 So. 2d 1238, 1240 (Fla. 2d DCA 1997). In <u>CH2M Hill</u>, Pinellas County contracted with Hill, an engineering firm, to design a thirteen-mile waterbearing pipeline. <u>Id.</u> at 1239. The design specifications for the project stated that the pipe was to be manufactured in conformity with the American Water Works Association national standards. <u>Id.</u> AWWA specifications required that class II wire be used to manufacture the water pipe segments. <u>Id.</u>

To construct the pipe, Hill hired Interpace Corporation to manufacture the concrete pipe. <u>Id.</u> Interpace's proposal, which was reviewed and approved by Hill, stated that Interpace would use class IV wire in the pipe construction. <u>Id.</u> In addition to approving Interpace's proposal, Hill's duties under the contract also included preparing the project plans and specifications. <u>Id.</u> After construction, the pipe ruptured several times, and the County brought an action against Hill, alleging that Hill violated its contractual duties to the County by failing to perform in accordance with the engineering standard of care. <u>Id.</u> The three engineering experts who testified at trial stated that it

was the design engineer's responsibility to review and approve the proposal for the pipe manufacturing.  Id. at 1240.  The experts further stated that if Interpace's proposal did not conform to AWWA standards, then Hill should have rejected the proposal.  Id.  By approving the pipe manufacturing with the sub-standard wires, Hill breached the standard of care for engineers.  Id.  The court stated that "the legal duty imposed upon professionals who contract to provide services is to perform such services in accordance with the standard of care used by similar professionals in the community."  Id.  The court found, based on the testimony and evidence presented, that Hill did breach its design duties under the contract by not performing its contractual duties in accordance with the professional standard of care.  Id.

Furthermore, such actions based on professional negligence are not limited by the economic loss rule when the parties are in contractual privity.  Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc., 891 So. 2d 532, 543 (Fla. 2004); Moransais v. Heathman, 744 So. 2d 973, 976 (Fla. 1999).  The economic loss rule prohibits the filing of tort actions in order to recover solely economic damages when the parties are in contractual privity.  Am. Aviation, 744 So. 2d at 536.  However in situations involving professional malpractice, the courts extend an exception to the economic loss rule even when there is an underlying contract between the parties.  Id. at 542.  Thus, while parties do have the option to file a tort action for professional malpractice, they are not required to do so.  An action for professional negligence may also be pursued as a contract action as well.  See CH2M Hill, 698 So. 2d at 1240.

Nevertheless, regardless of whether a professional negligence action is pursued in tort or in contract, a statute of limitations of two years applies.  "An action for professional malpractice . . . whether founded on contract or tort" must be brought within two years from the time the cause of

action is discovered. Fla. Stat. § 95.11(4)(a). This action was filed on June 14, 2005. The work on the project concluded in May 2001, when a certificate of occupancy was issued and BCMS took possession of the nursing home. However, by its own terms, the Construction Contract was not completed until all liens against the project had been cleared by the Contractor and final payment had been made by BCMS. Because of a lien asserted by the Contractor's subcontractor, final payment on the project was not made until February 2002, after the lien issue had been resolved. Thus, the Construction Contract was not completed until that time. The evidence shows that at least as early as 2001 BCMS believed that the HVAC selection and design was defective. (Joint Ex. 12 (Markos July 25, 2001 letter to Summit Smith regarding HVAC problems).)

BCMS was perfectly within its rights to pursue a claim for professional malpractice as a breach of contract action, and it was not required to bring that claim in tort. However, regardless of whether BCMS brought this claim in tort or as a breach of contract, it was required to pursue its claim of professional malpractice for failing to perform the contractual duties with the professional standard of care within the two year statute of limitations period. BCMS argues that the statute of limitations of four years for an action based on "the design, planning, or construction of an improvement to real property" should be applied. Fla. Stat. § 95.11(3). An argument that the more general four year statute of limitations applies to this breach of contract for professional malpractice claim is unavailing. When there are two conflicting statutes of limitations, one imposing a shorter period than the other, or when there is a substantial question as to which statute should apply, it is the shorter of the two periods which governs. See Sheils v. Jack Eckerd Corp., 560 So. 2d 361, 363 (Fla. 2d DCA 1990).

In this case, the Court finds that the two year statute of limitations for actions of professional malpractice is the more specific statute, since it applies to a very specific class of a cause of action, as opposed to section 95.11(3), which covers actions dealing with a broad class of claims dealing generally with improvements to real property.  "[W]here a general law that applies to numerous classes of cases conflicts with the law that applies only to a particular class, the latter, or more specific law, generally controls even when, in regard to statutes of limitations, the general provision provides for a longer period than the more specific provision."  Id.  Therefore, to the extent that BCMS alleges a breach of contract for professional malpractice or failure to adhere to professional standards of care, BCMS's claim is barred by the statute of limitations.

Thus, once the claims for professional malpractice are removed from the Second Amended Complaint, BCMS is left with a simple breach of contract action.   BCMS argues that the Construction Contract contains an implied covenant of good faith, which Summit Smith also breached.  Every contract in Florida carries with it an implied covenant of good faith and fair dealing.  Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999); County of Brevard v. Miorelli Eng'g, Inc., 703 So. 2d 1049, 1050 (Fla. 1997).  However, this implied covenant is not an independent cause of action, and may be maintained only in connection with a breach of an express contract provision.[7]  Burger King, 169 F.3d at 1316.  The parties agree that a valid contract was formed.  Therefore, the question remains as whether there was a material breach of an express provision of that contract.

---

[7]  The rights conferred by the implied covenant of good faith are limited.  Hosp. Corp. of Am. v. Fla. Med. Ctr., 710 So. 2d 573, 575 (Fla. 4th DCA 1998.)  The duty of good faith must be tied to an express term of the contract, and it may not be asserted as an independent cause of action "when all other terms have been performed pursuant to the contract requirements."  Id.

The Construction Contract required that a DX system be designed and installed in the hospital, as stated in Change Order No. 1. Summit Smith designed and installed a DX system. The evidence presented to the Court shows that Summit Smith properly designed and installed a DX system as required by the contract. The installed DX system has functioned in the hospital, performing within the applicable guidelines. BCMS has failed to establish that the original design of the system was flawed. Moreover, four of the five engineers who rendered an opinion regarding the size of the HVAC system agreed that the system is not undersized, it was designed appropriately, and the tonnage used was appropriate. The evidence shows that the performance issues experienced by BCMS were likely caused by poor maintenance of the system on the part of BCMS. In any event, BCMS did not prove by a greater weight of the evidence that the DX system was designed improperly.

Mr. Markos and BCMS have argued that even if Summit Smith's actions did not constitute professional malpractice, it was still a breach of the Construction Contract for Summit Smith to have recommended and installed a HVAC system that was not proper for a hospital in Florida. BCMS contends that the DX system was never a proper HVAC system for a hospital, and thus the option of a DX system should have never been presented to Mr. Markos as an acceptable HVAC system alternative. However, none of the experts who testified in this case would state that a DX system was an inherently improper HVAC system for a hospital. Mr. MacPhaul and Mr. Hahn both testified that a DX system does comply with the standard of care for hospital engineering and construction. (MacPhaul Test. Trial Tr. vol. 8, 162; Hahn Test. Trial Tr. vol 12, 59.) All the engineers who testified in this case did state that a chiller system would be a better option for a hospital. Mr. Hahn testified that "if first cost were of no concern, [a chiller system] would be what [he] would

recommend." (Hahn Test. Trial Tr. vol. 12, 121.)  Mr. MacPhaul agreed that "the preferred method for health-care facilities and mechanical cooling is the chilled water system." (MacPhaul Test. Trial Tr. vol. 8, 228.)  But, even though the chiller system was the better option in hindsight, the DX system is an acceptable HVAC system for a hospital in Florida.

The DX system provided several initial benefits to BCMS.  First, the DX system had a lower installation cost, which gave BCMS significant upfront savings.  Second, BCMS was able to use those extra funds to expand the size of the medical office building without increasing the price of the Construction Contract.  Third, the expansion of the medical office building gave BCMS the proper facility with which to attract speciality doctors to practice at BCMS, thus increasing the prestige and profitability of the hospital.  Mr. Markos, when presented with the option of a lower cost HVAC system, made the deliberate choice to save on initial costs and expand the medical office building.  Mr. Markos argued to the Court that Summit Smith should have never presented him with the option of the DX system, and Summit Smith should have recommended the chiller system as the better option.  The Court finds that Summit Smith did recommend the chiller system as the best option for a hospital by including the chiller system in the original construction plans and contract. The DX system was only presented as an option after Mr. Markos made the determination to try and lower the initial costs and expand the medical office building.

In retrospect, the chiller system would have been the better option for BCMS as the DX system has had higher energy and maintenance costs.  While the Court is sympathetic to the plight of BCMS, the fact remains that a valid contract was formed and Summit Smith performed its obligations under the contract.  Therefore, the Court finds that Summit Smith did not breach its contract with BCMS.  Since there is no breach of the contract, BCMS is not entitled to any damages.

B.      Summit Smith's Indemnity Claim Against ECI

Under Florida law, a claim for common law indemnity involves two elements.  First, the indemnitee must be "vicariously, constructively, derivatively, or technically liable for the wrongful acts of the" indemnitor.  Houdaille Indus., Inc. v. Edwards, 374 So. 2d 490, 492 (Fla. 1979). Second, the indemnitee must be entirely without fault in causing the loss.  Id. at 494.  In this case, the Court has found that Summit Smith, the indemnitor, did not commit a wrongful act and there was no liability to BCMS.  Since there are no damages in this case, Summit Smith's claim against ECI is not necessary.  Therefore, Summit Smith's claim against ECI for contribution and indemnification fails as a matter of law.

IV.    Conclusion

The Court finds, that to the extent BCMS alleges an action for professional malpractice, it is barred by the statute of limitations.  The Court finds that Summit Smith performed its contract with BCMS by properly designing and installing a DX system as selected and required by the Construction Contract.  Therefore, Summit Smith did not breach the contract with BCMS.  Since Summit Smith is not liable, its claims for indemnification against ECI fail as a matter of law.

Accordingly, the Court finds in favor of the Defendants.  The Court also finds in favor of Third-Party Defendant, ECI.  ECI's Motion to Dismiss (Doc. #211) is denied as moot.  The Clerk is directed to enter judgment in favor of Defendants, Summit Smith L.L.C. and C.D. Smith Construction, Inc., and Third-Party Defendant Engineering Concepts, Inc.

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this <u>29th</u> day of May, 2008.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:
All Counsel of Record